# MEAD v. DAVIS.

PATENTS; INTERFERENCE; DILIGENCE.

1. The question of what is due diligence is a question of mixed law and fact. There is no hard and fast rule by which to determine its existence in a particular case, but it must be determined by all of the facts and surrounding circumstances. (Following *O'Connell* v. *Schmidt*, 27 App. D. C. 77.)

2. Where an invention is intended to apply to a business just beginning to develop, the inventor is entitled to a reasonable time to perfect his invention before applying for a patent.

3. In an interference proceeding, involving the invention of an overhead trolley line structure for electric railways adapted for high voltage and high-speed service, it was *held* that the junior party was not lacking in diligence, and was entitled to an award of priority, where the evidence showed, among other things, that nine months, less one day, had elapsed between the date of a drawing which he made disclosing parts of the invention of the issue, and his filing date, and that a second drawing made by him, completing the entire invention, was finished the following month; that during the interval constant efforts were made by him and a brass company, his assignee, with which he was connected, and which was in no condition to make practical test of the invention under conditions of actual use, such as was necessary, to secure an introduction of the invention. (Distinguishing *Seeberger* v. *Dodge*, 24 App. D. C. 476 and *Laas* v. *Scott*, 26 App. D. C. 354, and following *O'Connell* v. *Schmidt, supra.*)

No. 492. Patent Appeals. Submitted May 14, 1908., Decided June 9, 1908.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference proceeding.  *Reversed.*

The facts are stated in the opinion.

*Mr. Frank T. Brown* and *Mr. Francis A. Hopkins* for the appellant.

*Mr. Wesley G. Carr* for the appellees.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

This is an appeal from a decision of the Commissioner of Patents in an interference proceeding having the following issue in seventeen counts:

"1. In an overhead structure for electric railways, the combination with a pole and an arm projecting laterally therefrom, an inclined brace rod between said arm and said pole, insulators adjustably mounted upon the laterally projecting arm, a messenger cable suspended from one of said insulators, a trolley conductor suspended from said messenger cable, and a steadying rod extending between the trolley conductor and the other insulator.

"2. In an overhead structure for electric railways, a trolley conductor, a messenger wire or cable from which the trolley conductor is suspended, a supporting structure embodying adjustable insulators, means for suspending the messenger wire or cable from one of said insulators, and a steadying rod between the trolley conductor and the other insulator.

"3. The combination with an approximately horizontal rod or bar, of a circumferentially grooved, tubular insulator that is so mounted upon said arm or bar as to be longitudinally adjustable, and means for detachably clamping the insulator in any position to which it may be adjusted.

"4. The combination, with a circumferentially grooved insulator having a hole extending longitudinally through it, of a supporting member of less diameter than said hole, upon which the insulator is mounted, and means for clamping the insulator in any position in which it may be longitudinally adjusted.

"5. A cylindrical porcelain insulator for an electric conductor, having one or more circumferential grooves, and provided

with means for so clamping it to an internal support that it may be longitudinally adjusted thereon.

"6. A tubular insulator having circumferential ridges, and means for so clamping it to a supporting arm or bar that it may be longitudinally adjustable.

"7. In a suspension device for trolley or other wires or conductors, an arm or bracket, an insulator sleeved thereon, a trolley or other wire or conductor supported by said insulator, and an insulated brace rod connected to said wire or conductor.

"8. In a suspension device for trolley or other wires or conductors, an arm or bracket, an insulator sleeved upon said arm or bracket, a trolley or other wire or conductor supported by said insulator, an auxiliary insulator, and a brace rod connected to said auxiliary insulator and to said wire or conductor.

"9. In a suspension device for trolley or other wires or conductors, an arm or bracket, an insulator sleeved thereon, an auxiliary insulator also sleeved upon said arm or bracket, a trolley or other wire or conductor supported by said first-mentioned insulator, and a brace rod connected respectively to said auxiliary insulator and to the trolley or other wire or conductor.

"10. In a suspension device for trolley or other wires or conductors, an arm or bracket, an insulator sleeved thereon, a messenger wire supported by said insulator, a trolley or other wire or conductor suspended from said messenger wire, an auxiliary insulator, and a brace rod respectively connected to said auxiliary insulator and said trolley or other wire or conductor.

"11. In a suspension device for trolley or other wires or conductors, an arm or bracket, means for supporting the same, an insulator carried by said arm or bracket, a messenger wire supported by said insulator, a trolley or other wire or conductor suspended from said messenger wire, an auxiliary insulator also mounted on said arm or bracket, and a brace rod respectively connected to said auxiliary insulator and to said trolley or other wire or conductor.

"12. The combination with a supporting post, an arm or bracket supported at one end by said post, a brace connecting said arm or bracket and post, an insulator sleeved upon the free

end of said arm or bracket, a trolley or other wire or conductor supported from said insulator, and means for bracing said trolley or other wire.

"13. The combination with a supporting post, an arm or bracket supported at one end upon said post, a brace connecting said arm or bracket and said post, an insulator sleeved upon said arm or bracket, a messenger wire supported by said insulator, a trolley or other wire or conductor suspended from said messenger wire, and means for bracing said trolley or other wire or conductor.

"14. In a suspension device for trolley wires or other conductors, an arm or bracket and means for supporting the same, in combination with a sleeve composed of insulating material into which said bracket passes, means passing around said sleeve for supporting a trolley wire or conductor, and adjustable means on the bracket for holding the sleeve against longitudinal movement thereon.

"15. In a suspension device for trolley wires or other conductors, an arm or bracket, means for supporting the same, in combination with a sleeve composed of insulating material, and through which said bracket passes, the outer or free end of said bracket being of uniform diameter, whereby the sleeve may be adjusted longitudinally on said arm, the sleeve having means for supporting a trolley wire and holding the wire against movement longitudinally of the sleeve, and adjustable means for holding the sleeve against movement longitudinally on said arm.

"16. In a suspension device for trolley wires or other conductors, an arm or bracket, and means for supporting the same in substantially a horizontal position, in combination with a sleeve composed of insulating material, through which said arm passes, the outer or free end of said arm being of smaller diameter than the passage through the sleeve, whereby the sleeve may be slipped over the outer end of the arm after the arm is fixed in place, or may be removed therefrom, and means for holding the sleeve against longitudinal movement on the arm.

"17. In a suspension device for trolley wires the combina-

tion with a supporting post, of a bracket support at one end of said post, a brace rod supporting said bracket on the post, an insulator sleeved upon the free end of said bracket, a messenger wire supported by said sleeve and a trolley wire or other conductor suspended from said messenger wire."

The invention of the issue is designed for supporting insulating overhead trolley conductors, which are utilized for supplying high voltage energy to high speed alternating current electric railways, and embodies a specific arrangement of an adjustable insulator, and supports by means of which the trolley wire is held in a position over the middle of and substantially parallel with the track. As stated by the Examiners-in-Chief, the counts may be arranged roughly in two groups or divisions; one embracing counts 3, 4, 5, 6, 14, 15, 16, and 17, and the other the remaining counts. The first-named group does not require means for bracing the trolley conductor, defined in some of the counts, on the steadying or brace rod, while the second does.

It is admitted that the real parties in interest, as the owners of the invention claimed, respectively are the Ohio Brass Company, and the Westinghouse Electric & Manufacturing Company. Harry P. Davis and Theodore Varney [the appellees] are engineers in the employ of the Westinghouse Company, and their application was filed October 19, 1904. George A. Meade [the appellant] is the engineer of the Ohio Brass Company, and filed December 2, 1904. In their preliminary statement, Davis and Varney allege the conception of count 1 and disclosure "between the 8th day of April and the 5th day of August, 1904, and reduction to practice "between the 5th day of August and the 1st day of October, 1904." They allege that counts 5 and 6 were conceived and disclosed "between the 1st day of March and the 6th day of April, 1904," and reduced to practice "between the 6th and 30th days of April, 1904." The conception and disclosure of counts 2, 3, 4, and 7 to 17 inclusive are alleged as "between the 1st day of March and the 20th of June, 1904;" reduction to practice "between the 20th day of June and the 15th day of July, 1904."

Mead's preliminary statement alleges the conception of the invention embraced in counts 1, 3, 4, 5, 6, 14, 15, 16, and 17 "in the latter part of February, 1904," and of counts 2, 7, 8, 9, 10, 11, 12, and 13 "in March, 1904." He alleged disclosure of the first group with sketches "on or before the 2d day of March, 1904," and the making of a drawing of the same "on the 3d day of March, 1904." He alleged the disclosure of the second group "in the month of March, 1904." He further alleged the disclosure of the entire issue "to Harry P. Davis and others connected with the Westinghouse Company in the spring or early summer of 1904." He further alleged the completion of a full-size operating device capable of being used for the purposes intended, of December, 1904, and the subsequent manufacture and sale of several hundred of the devices embodying the counts of the issue.

The Examiner of Interferences found that Mead had the drawing made on March 3, 1904, which illustrates a horizontal arm attached to a pole, an adjustable insulator thereon, and a brace for the arm; and that he had a conception of all the counts by the last of March, 1904. He awarded conception to Davis and Varney as to all counts as early, at least, as April 21, 1905. He then held that Mead had failed to show disclosure of the invention to Davis and Varney in April, 1904, as alleged; that he had not reduced to practice prior to his filing date of December 2, 1904; and that he was not diligent in the prosecution of his invention at the time when Davis and Varney entered the field. He therefore awarded priority to the latter.

The Examiners-in-Chief held that Mead was the first to conceive as to counts 3, 4, 5, 6, 14, 15, 16, and 17; that Davis and Varney conceived as to all counts, save No. 1, as early as April 21, 1904, as to count 1, as early as July 20, 1904. They found that the evidence was insufficient to show that Davis and Varney obtained their information from Mead, and also that Mead was lacking in diligence. They therefore affirmed the decision of the Examiner of Interferences.

The Commissioner, after reviewing the previous decisions, said: "The record before us leaves no doubt that Mead was the

first to conceive the invention, but the last to reduce the same to practice, and this seems not to be questioned." He found, however, that Mead was lacking in diligence. He found it unnecessary to determine the exact date of conception by Davis and Varney, which, he said, occurred sometime before July 11, 1904. He also held the evidence insufficient to show communication by Mead to Davis and Varney, and affirmed the decision in their favor.

Without reviewing the evidence on the point, we concur in the finding that Mead was the first to conceive the invention of the issue.

Arthur L. Wilkinson, the secretary of the Ohio Brass Company, testified to calling on L. A. Osborne, fourth vice president of the Westinghouse Electric & Manufacturing Company, on April 5, 1904; that they conversed in regard to the new. feature of high voltage then beginning to attract attention; and that he told him of Mead's invention. A suggestion was made that there should be a conference between their respective engineers. Osborne denied that the invention was communicated, but said that the conversation had relation only to the sale by the Ohio Brass Company of certain of its overhead constructions as shown in its catalogue, etc. On April 15, 1904, Osborne wrote to C. K. King, vice president of the Ohio Brass Company, saying: "Referring to our conversation to-day on the matter of overhead trolley material, and to your suggestion that your engineers meet with our engineer to discuss the subject, I have to advise that our Mr. Davis will be glad to see your Mr. Mead here one week from today, that is, the 22d inst." This meeting was held as arranged. Mead says that he then showed his drawing of March 3, 1904, to Davis, and also marked on it showing the additional features, the drawing for which had not then been made, though in the hands of the draftsman. Davis denied that a drawing was shown him, or any explanation made. He says that the conversation related to low voltage currents, and to Mead's desire to influence him to recommend that the two companies join in the development of material for high voltage currents. That Mead stated he would like to submit some de-

signs for high tension material, to which witness agreed. Mead left, "stating that as soon as these plans were developed he would advise me and return with them." That nothing was again heard from Mead until June or July, when he showed some sketches, very elementary in character, showing a sleeve type of insulator. This "resembled so closely those which we had developed I felt confident that some information had been given to him of our designs. As we had already completed designs, manufactured models, and had a complete line of details developed and in process of manufacture, and had had a sample of the construction erected for some months, I felt that it was waste of time on both his part and my own to carry the matter along farther. I therefore did not go into details with him, but only briefly discussed his plans, and brought the interview to a close." There was no third person present at any of these interviews, and the burden is upon Mead to show what occurred.

In this conflict of statements, there are circumstances which tend to corroborate the evidence of Wilkinson and Mead. The invention was known to Wilkinson when he visited Osborne, because he had seen and had explained to him the completed drawing of March 3, 1904. If the sole object of his interview was an arrangement for supplying his well-known materials, no reason appears why the matter should have been referred to the engineer for investigation and consideration, instead of to the purchasing agent. Nor does it appear why Osborne and Wilkinson were not competent to settle such a matter without the intervention of the engineers. On the other hand, it was quite natural to refer to the engineers any matter of contemplated construction and introduction.

Mead was in full possession of the invention, and it was one that his company was not prepared to put in actual practice. The best that it could do was to have the matter taken up by some one operating or controlling a railway, and then manufacture and furnish the several items of construction. Mead had, in March, explained his plans to parties engaged in constructing a railway, in which the Westinghouse Company was in some

way concerned. There was every reason, therefore, why he should take his drawing with him for exhibition to Davis, and none why he should have concealed it. And if the purpose was to secure a contract for making new material, there is no reason why Davis should have concealed his invention, especially on July 11, 1904, when, as he said, the patterns were being made. We do not find it necessary, however, in view of our conclusion as to the diligence of Mead, to determine this issue.

We cannot agree with the Commissioner that Mead, having been the first to conceive the invention, has lost his right to a patent for it by reason of negligence. The question of what is due diligence is a question of mixed law and fact. There is no hard and fast rule by which to determine its existence in a particular case. It must be determined by all the facts and surrounding circumstances in the particular case. *O'Connell* v. *Schmidt,* 27 App. D. C. 77, 82. The Ohio Brass Company was in no condition to make a practical test of the invention under conditions of actual use. It had no electrical railway plant, and no interest in, or control over one. The most it could do was to obtain its trial and adoption by some one constructing or controlling an electric railway using, or proposing to use, the high voltage alternating current. In March, after his drawing had been made, Mead applied to the parties constructing the Indianapolis & Cincinnati Electric Railway to have them try his invention. They had one of their own in contemplation, which they preferred to try, and, moreover, told Mead that the material used by them must first be approved by the Westinghouse Company. Passing by the interview with the Westinghouse people, it appears that an attempt was made to find some others engaged in the railway business who would use the invention, but without success. The Ohio Brass Company was not engaged in manufacture of porcelain, and in July concluded to have the adjustable insulators made. They gave an order to the Lock Porcelain Company to make some, which were delivered in October, 1904. In September, 1904, they procured a visit from the officers of an electric road at Atlanta, and tried to get them to adopt the invention. As they did not intend to

use more than 1,000 or 2,000 volts, they thought it was unnecessary, as it was more expensive than the old form for low voltage. Early in December they attached arms to a fence in the factory, and put on their adjustable insulator, with a view to see how it would appear and operate in that way without wires and electric current. Early in 1905, they manufactured and sold some of the appliances to the West Shore Railway, none of which have been reported as unsatisfactory. That it was no easy matter to manufacture and put the new invention in operation appears from the fact that the Westinghouse people, though claiming invention early in April, did not put it to actual test on their "interworks railway" until August or September. They first put it up, as their testimony tended to show, in a building without using a current, and when it was used on the interworks railway two sections of the road were equipped with other devices, one of which was that devised by Jones for use on the Indianapolis & Cincinnati Railway, before referred to. The conditions presented by the evidence in this case make it quite different from those in *Laas* v. *Scott,* 26 App. D. C. 354, 361, which the Commissioner cited in support of his conclusion. In that case the device was a comparatively simple one that could have been quickly made. Scott had sufficient means for the purpose, and was engaged in making some other inventions. From May 12, 1902, until late in the fall of 1903, he did nothing. For more than a year before his rival entered the field, he had done nothing but attempt to induce Walker, a capitalist, to join him in the exploitation of the invention. Walker was not willing to undertake it before October, 1903, when he agreed to a plan that was completed in December. Scott had sufficient means of his own to exploit the invention, though not on the large scale which he, perhaps, contemplated with the aid of Walker. For this reason, he was held wanting in due diligence.

It is true that Mead might have gone into the Patent Office and preserved his rights by constructive reduction to practice. As the invention was intended to apply in a business then beginning to develop, he was entitled to a reasonable time to perfect his invention before asking for a patent. The case of *See-*

*berger* v. *Dodge,* 24 App. D. C. 476, also cited by the Commis-
sioner, holds that, where an inventor cannot reasonably reduce
to actual practice, he should show diligence by applying for a
patent. It was said there: "Granting the contention that actual
reduction to practice is preferable to that which is constructive
merely, as more to the interest of the public, and that reasonable
indulgence ought to be extended to one pursuing that course in
good faith, yet, when the construction of an experimental device
involves so great cost and risk that an inventor, though possessed
of sufficient means, may well hesitate to undertake the same en-
tirely at his own expense, due diligence requires that he should
then attempt to secure his right and promote the public interest
by filing an application for a patent." What was then said must
be considered in connection with the facts to which it applied.
The invention was of a very expensive device known as an esca-
lator. Seeberger was a man of means, and might have built and
operated one; but the expense was so great that it was hardly
reasonable to do so under the circumstances. He had conceived
the invention in May, 1895, and shortly thereafter had a com-
pleted drawing. His evidence tended to show that he had tried
at various times to have his escalator constructed and put in
public use, but without success. He was interested in other pat-
ents, two of which he had applied for himself; one in Decem-
ber, 1895, and the other May 19, 1896. He had purchased an
interest in Wheeler's patent. In this instance he delayed filing
until October 22, 1901, while his rival had filed on January 22,
1898. He had seen Dodge's device in December, 1897, and had
some talk with him about uniting their interests. In conclusion
the court said: "The failure of Seeberger to make an application
before, and especially after seeing Dodge's device and hearing
his statement, can only be attributed, in our opinion, to his con-
fidence in the scope of the Wheeler patents. He owned one half
of the later one of these by assignment made before issue, and in
June, 1896, purchased a half interest in the earlier one,— *
* * He made this last purchase because he had been advised
that it was 'necessary in order to control the field.' And so es-
sential to his interests did he regard the ownership of this patent

that on August 13, 1896, he secured an option to purchase Wheeler's remaining interest, which was finally exercised in 1897. For obvious reasons, his confidence in the dominating scope of the Wheeler patents is no excuse for delay. *Platt v. Shipley,* 11 App. D. C. 576, 583."

In the case at bar, nine months, less one day, elapsed between the date of the first drawing on March 3, 1904, and the date of filing. The second drawing, completing the entire invention of the issue, was not completed until April. During the interval, efforts were made to secure the introduction of the invention, which, under all the circumstances, we think constituted sufficient diligence to entitle him to the benefit of his earlier conception. The facts and circumstances bring the case more nearly within the ruling made in *O'Connell v. Schmidt,* 27 App. D. C. 77, 82, than that in the other cases mentioned. Probably, had Davis intimated to Mead, at their last meeting in July, 1904, that he had conceived the invention, the latter might have filed an earlier application.

We think it was error to award priority to Davis and Varney, and the decision will be reversed, and priority awarded to Mead. It is so ordered, and that the clerk certify this decision to the Commissioner of Patents.                      *Reversed.*